## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| SHARON ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 00-JEO-2203-S |
| | ) | |
| AMSOUTH BANK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ENTERED**

**MAY 2 0 2002**

### <u>MEMORANDUM OPINION</u>

Before the court is the defendant's Motion for Summary Judgment. (Doc. 17).[1]  Sharon

Alexander (the "plaintiff") filed this action against AmSouth Bank (the "defendant" or

"AmSouth"), her former employer.  The plaintiff alleges that she was the victim of disparate

treatment, a hostile work environment and harassment, and that she was terminated in violation

of Title VII of the Civil Rights Act of 1991, as amended by the Pregnancy Discrimination Act, 42

U.S.C. § 2000e(k).  (Doc. 1 at Counts I - II, IV).  She also alleges that she is a victim of

retaliation by the defendant after she complained about her situation.  (*Id.* at Count III).  She

further alleges various state law claims, including negligent supervision, training and retention

and intentional infliction of emotional distress.  (*Id.* at Counts V - VII).

The defendant seeks summary judgment on the grounds that there are no genuine issues

of material fact and that it is entitled to judgment as a matter of law on all the plaintiff's claims.

(Doc. 17 at 1).  It has submitted a brief and exhibits in support of the motion, as well as a reply

brief.  The plaintiff opposes the motion insofar as it attacks her pregnancy discrimination claims,

---

[1] References to "Doc. __" are to the documents as numbered by the clerk of court in the court's record of the case.



brief. The plaintiff opposes the motion insofar as it attacks her pregnancy discrimination claims, but she does not oppose it with respect to her harassment, hostile environment, retaliation, and state law claims. (See Doc. 20 at 1).

For the reasons set forth below, the court finds that the defendant's motion for summary judgment is due to be denied with respect to the plaintiff's pregnancy discrimination claim and granted with respect to her remaining claims.

## I.   SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless,

the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.   FACTUAL BACKGROUND[2]

The plaintiff began working at AmSouth Bank on January 4, 1993, as a teller in the Gardendale Branch. (Alexander Depo. at 44, 50).[3] When she was hired, management informed her of the bank's policies, including teller overages and shortages of money and negotiating checks. (*Id*. at 53; Hutchinson Depo. at Pl. Ex. 11).[4] Thereafter, she received a memorandum regarding the requirements related to these policies every six months. (Alexander Depo. at 53). When an employee violates one of the bank's policies, the employee is to be monitored, coached and disciplined. After a first occurrence, as defined by bank policy,[5] the employee is to be disciplined and coached. (Doc. 19, Ex. G). After a second occurrence, the employee is to be disciplined, coached and retrained. (*Id*.). After a third occurrence, the employee is to be disciplined, coached, trained, and advised that the next occurrence will result in disciplinary action up to and including termination. (*Id*.). After a fourth occurrence, the employee is to be terminated if "there are no mitigating circumstances to prevent  the employee's termination." (*Id*.).

---

[2] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3] The deposition is located at document 19, exhibit A. Excerpts of the same are found at document 20.

[4] Hutchinson's deposition is found in the record at document 19, exhibit G.

[5] Under the heading of "Cash Item and Return Deposit Items," the policy defines a violation as an occurrence where "an item or items the teller negotiates [is] returned unpaid." (Vince Hutchinson Depo. (located at doc. 19, Tab C) at Pl. Ex. 11). A shortage or overage is defined as "the difference in the amount of cash in the teller cash drawer and the balance on the teller's balance sheet." (*Id*.).

The defendant's practices allowed tellers to cash a check within his or her limits for an AmSouth customer they recognized by sight. (Hutchinson Depo. at 56). The customer's account number usually was placed on the check. (Rena Ramsey Depo. at 50-51).[6] A thumbprint was not required, but the teller would be responsible for that item. (Hutchinson Depo. at 56-58; Ramsey Depo. at 50). It was the policy of the defendant "to get a thumbprint with a noncustomer check." (Alexander Depo. at 66; Ramsey Depo. at 50-51).

Alexander's employee performance reviews show that she consistently performed at an as "[e]xpected" level or better. (Doc. 19 at Ex. M). The only negative evaluations were in the "[q]uality of [w]ork" area. In her November 1994 performance appraisal, it was noted that she needed to improve her overages and shortages. (*Id.* at 11-23-94 Employee Performance Appraisal Form). In her February 1997 evaluation, it was noted that her "year to date over[age] and short[age] is $2,086.16 a/o 10-31-1996." (*Id.* at Pl. Ex. 5). Her February 1998 evaluation stated that her year-to-date overage and shortage was "in excess of $2,000 for the second consecutive year. As a result she was moved from head teller to a window teller specialist." (*Id.* at Pl. Ex. 4). Her 1999 evaluation also indicated that the quality of her work needed improvement. (Alexander Depo. at 63-64). She also received a number of letters of recognition during 1994 and 1995, regarding her performance. (Doc. 19, Ex. M at Pl. Ex. 2).

Vince Hutchinson was hired as the Manager of the Gardendale Branch of AmSouth Bank in August 1998. (Hutchinson Depo. at 11). He came from another bank.

In an August 11, 1998 Memo, Hutchinson informed the plaintiff that she had various balance discrepancies in five months during the last year. She was told that '[i]f another shortage

---

[6] Ramsey's deposition is located in the record at document 19, tab D.

4

occurs, however, and it does not meet bank policy, you will be dismissed.  This will remain in effect until September 1998."[7]  (Hutchinson Depo. at Pl. Ex. 3).  On October 7, 1998, the plaintiff received a "Final Warning" regarding her performance.  It stated, in part, that the plaintiff "reached or exceeded the limits. . . on Tellers Over and Short" and "any variances outside the monthly limits set forth in the non-credit loss plan will result in termination." (Hutchinson Depo. at Pl. Ex. 4) (emphasis in original).  On November 24, 1998, the plaintiff transferred, on her request, to the main office in a "nonmonetary" position because she "was in trouble with the teller over and short policy."  (Alexander Depo. at 50-52).

On January 4, 1999, the October memo was replaced by another "Final Warning" memo which stated that the prior memo was issued in error because the plaintiff only had three occurrences outside of the teller over and short policy and not five as stated in the memo.  (*Id.* at Pl. Ex. 5).  She requested a transfer back to Gardendale after this memo was issued.  She was so transferred in May 1999 as a teller.  (*Id.* at 52-53).

On September 27, 1999, Ruth Burks,[8] an AmSouth account holder,[9] entered the bank and negotiated a $1,500.00 check on her brother-in-law's AmSouth account (John T. Burks) without his authorization.[10]  (Ramsey Depo. at 57-58; Ex. 11, p. 3).  The plaintiff cashed the check. When the plaintiff negotiated the check, she wrote Ruth Burks driver's license number on the

---

[7] The memo stated that she had five occurrences in August 1997, three in September 1997, three in December 1997, five in January 1998, and nine in July 1998.  (Hutchinson Depo. at Pl. Ex. 3).

[8] Ruth Burks' name is also referenced as Ruth Burke in the record.

[9] Ruth Burks and her husband had an AmSouth account that was opened on August 20, 1980.  (Hutchinson Depo. at Ex. 8).

[10] Ruth Burks negotiated a second check in an Arab branch of AmSouth as well.

5

back.  John T. Burks signed an affidavit on October 9, 1999, stating that the check was a forgery

and that he did not sign or authorize the cashing of the check.  (Hutchinson Depo. at 47 & Ex. 6;

Ramsey Depo. at Ex. 11, p. 3).  (Hutchinson Depo. at 47).

   The matter was handled by AmSouth's security department and not pursued by

Hutchinson or Alexander because it required investigation and was not considered a simple

collection matter.  (Hutchinson Depo. at 78-79).  Using the driver's license number on the back

of the check and other information, the defendant's investigator determined it was negotiated by

Ruth Burks.  She was interviewed by the investigator on October 26, 1999.  She ultimately

admitted her participation in the fraud.  A warrant was issued for her arrest on November 9,

1999.  (*Id.* at p. 4).

   Hutchinson learned the plaintiff was pregnant on December 31, 1999.  (Hutchinson Depo.

at 35).  She called him from the doctor and he congratulated her.  (Alexander Depo. at 74).

Shortly thereafter she talked with Marie Gann, the assistant branch manager, about taking her

vacation leave with her maternity leave.  Gann told her that would be fine.  (Alexander Depo. at

77).

   Alexander was disciplined on January 6, 2000, because of her overages and shortages in

December 1999 were over $1,000.00.  (Hutchinson Depo. at 67-68; Pl. Ex. 10; Alexander Depo.

at 53, 55-56).[11]  Hutchinson discussed this situation with Rena Ramsey, the vice president of

employee relations.  (Ramsey Depo. at 7, 17-19).  They considered terminating Alexander at this

point, but decided not to do so.  (Ramsey Depo. at 17-18, 20).  Ramsey did not know the plaintiff

---

[11] She believes there were other tellers who also had occasions when they were out over $1,000.00 and were not terminated. She believes they were Ann Rickles and Judy Calvert.  (Alexander Depo. at 58-59).

was pregnant at that time. (*Id.* at 21). She learned that fact after the plaintiff was terminated. (*Id.*).

Hutchinson learned about the forged $1,500.00 check around January 13, 2000.[12] (Hutchinson Depo. at 34). Hutchinson discussed the plaintiff's situation with Ramsey and Kelly Kemp, his sales manager in Gardendale. (*Id.* at 41, 63-65; Ramsey Depo. at 23). Hutchinson recommended that the plaintiff not be terminated. (Ramsey Depo. at 23-24). He stated to Ramsey that the plaintiff was a long-term teller and a good employee. (Ramsey Depo. at 29). They discussed the $1,500.00 check, the January 6, 2000 discipline and her prior disciplines. (Ramsey Depo. at 25). Ramsey did not consider the plaintiff's past evaluations, letters of recognition or her personnel file. (Ramsey Depo. at 24, 30-41). After the discussion, it was determined by Ramsey and Kemp that the plaintiff would be terminated. (Hutchinson Depo. at 61-62, 66). They asked Hutchinson to concur, and he did. (Ramsey Depo. at 37; see also Hutchinson Depo. at 66-67).

The plaintiff was terminated on January 21, 2000. (*Id.* at 40). She was terminated because her handling of the $1,500.00 check violated the defendant's policy concerning cash items. (Hutchinson Depo. at 16-17; Ramsey Depo. at 16-17). At the time the check was negotiated, her limit for cashing a non-AmSouth customer check was $500.00 and her AmSouth customer cash-back limit was greater than $1,500.00. (Alexander Depo. at 55; Doc. 19, Ex. J). She was terminated because she did not obtain a thumbprint of the customer and because the check was returned to the bank unpaid as forged and it exceeded her approval limit. (Hutchinson

---

[12] By that time, the defendant apparently had received restitution in the amount of $1,500.00 from Burks through the Clerk of the Jefferson County District Court. (Ramsey Depo. at Ex. 10). However, there is no evidence they knew this prior to the plaintiff's termination.

Depo. at 17-18, 20, 52-53). Because the loss sustained was in excess of $1,000.00, the defendant's discipline policy included termination.[13]  (*Id.* at 58; Doc. 19 at Ex. G).  In reaching a decision on how to treat the plaintiff, Ramsey stated that the plaintiff's prior incidents that involved shortages or overages, particularly the January 6, 2000 occurrence, played a part in the decision.  (Ramsey Depo. at 17).

The plaintiff was later called into Hutchinson's office and was terminated by Hutchinson and Gann at the end of the day.  (Alexander Depo. at 67-68).  In the meeting, she was told that she cashed a check that was returned.  It did not have a thumbprint on it as was required.  When she asked to see the bank video for that day because she believed that she must have recognized the customer's face, she was told that security had it.  (Alexander Depo. at 82-83).  The plaintiff asked "how can I get another job?" and she was told by Gann that she "could draw [her] pennies until [she had] the baby." (*Id.* at 68).  Hutchinson told her that if she applied for a job elsewhere, they could not discriminate against her. (*Id.*).  Someone[14] also mentioned that she did not have to tell them she was pregnant.  (*Id.* at 68-69).

The plaintiff applied for unemployment compensation.  In a statement to the unemployment office, Hutchinson stated that the plaintiff cashed a check without proper identification.  (Hutchinson Depo. at 44-45).  The plaintiff's request for unemployment compensation was denied following a hearing.  (Alexander Depo. at 91-92).  Upon review, the Appeals Referee stated:

---

[13] This type of violation is treated like a "fourth occurrence" on the defendant's "Monitoring, Coaching and Discipline" policy.  (Doc. 19 at Tab G).

[14] The speaker was not identified.  However, only Hutchinson and Gann were there.

8

The claimant appealed an Examiner's determination which imposed a disqualification and denied benefits under the provisions of Section 25-4-78(3)(b) of the Unemployment Compensation Law. The determination was based upon a finding that the claimant was discharged from last bona fide work with this employer for misconduct committed in connection with work repeated after previous warning.

The claimant last worked for the listed employer on January 21, 2000. She had been employed since 1993 and last worked as a teller. The claimant was discharged by the branch manager for being in violation of the employer's non-credit loss policy. She had accepted a check in the amount of $1,500.00 from what she thought was a customer. The check turned out to be forged. The claimant did not follow the standard procedure of getting a thumbprint of the person cashing the check and getting approval for any check written over $500.00. She assumed that she recognized this customer and thought it was a regular customer. She admits that she knew she should have gotten a thumbprint.

The claimant had previously been warned for similar violations on the overage and under policy. She had been in excess of $1,000.00 of shortages for the month of December of 1999. She was issued a disciplinary report regarding that problem on January 6, 2000. The claimant attributes much of the shortage problem as acting as head teller on occasions.

Section 25-4-78(3)(b) of the law requires the disqualification of a claimant if she has been discharged from her most recent bona fide work for actual or threatened deliberate misconduct committed in connection with the work after previous warning. "Misconduct" is defined as conduct evincing a deliberate, willful, or wanton disregard of the employer's interests or of the standards of behavior which the employer has a right to expect of employees. Isolated instances of ordinary negligence and good faith errors in judgment do not constitute misconduct. The evidence does indicate that the claimant failed to follow established procedure in the cashing of a check that resulted in a large loss to the employer. That did not represent an instance of ordinary negligence, but rather extraordinary negligence. The claimant could easily have prevented that problem had she simply followed established procedure. Failure to do so constitutes an act of misconduct and the claimant had previously been warned. She is, therefore, subject to the disqualifying provisions of this section of the Law.

(Doc. 17, Alexander Depo., Def. Ex. 13). The referee's decision was affirmed by the ADIR

Board of Appeals. (*Id*. at Ex. 14).

9

At the deposition, the plaintiff identified Kim Davidson, Mary Brazier and Christie Gassaway as employees who worked for Hutchinson at the Gardendale branch.[15] They were all pregnant and ultimately terminated for various reasons. (Alexander Depo. at 111). Davidson and Brazier were terminated for excessive absences after they were counseled. (Hutchinson Depo. at 36-39; Alexander Depo. at 110-12, 114; Ramsey Depo. at 63-64). Gassaway was terminated because she exceeded the overage and shortage limit. (Alexander Depo. at 112-13). Ann Rickles, Judy Calvert, Leslie Zellner and Shannon (last name unknown) were not terminated when they violated the same rules. (Alexander Depo. at 84-86). According to the plaintiff, Rickles cashed a forged check when a non-bank customer forged an endorsement on her joint income tax return.[16] The plaintiff did not know the details concerning Calvert other than that she did not get approval for cashing a check outside her authority. (*Id*. at 88). Regarding Zellner, the plaintiff knew that she cashed checks over her limit without approval. (*Id*. at 84, 88-89).[17] The plaintiff did not know any details regarding Shannon. (*Id*. at 89-90).

The plaintiff also acknowledged at her deposition that she was aware that she had a $500.00 limit on cashing checks of persons who did not have an AmSouth account, that she needed supervisory approval for checks in excess of that amount, and that she needed a thumbprint for persons that did not have an AmSouth account. (Alexander Depo. at 100-02).

---

[15] Gassaway only worked there on Saturdays; she was regularly employed at the Tarrant branch. (Alexander Depo. at 112).

[16] The other payee was in prison at the time. (Alexander Depo. at 86). The plaintiff acknowledged that she did not know whether Rickles got a thumbprint or whether the check amount was outside her limit. (*Id*. at 86-87, 95). There is no evidence that the loss was in excess of $1,000.00.

[17] Zellner submitted an affidavit in this action wherein she stated that when she worked with the defendant from August 1994 through March 1999, she "had several occasions to cash checks on AmSouth accounts for customers which resulted in cash loss items which total[ed] $1,000.00 within one period of 12 months. These incidents were noted by management, but, no discipline action was taken and I was not terminated. During this period of time, [she] was not pregnant." (Doc. 19, Ex. L).

She was not shown the $1,500.00 check in question until the deposition. When she saw it, along with the investigator's report, showing a picture of Burks, she realized that Burks was an AmSouth customer. (Doc. 22 (Alexander Aff.)). She states that she negotiated the check because "[i]t was the informal practice of all tellers in the Gardendale Branch to negotiate transactions for regular customers with minimal formality. In light of that policy, [she] placed her [(Burks')] driver's license number on the back of the check and sent the transaction through the computer without any difficulty. At that time, [her] authorization for AmSouth customers was $5,000.00 if the transaction was on-line." (*Id.*). She further states:

> At the time of my termination I did not recall all of the circumstances of the cashing of the check or the identity of the person presenting the check. I asked for a copy of the check and to view the security tape, but my request was turned down. This is why I made admissions that I had violated the policy. My admissions were solely made on the false representations of Vince Hutchinson and other management at AmSouth that the person presenting the check was not an AmSouth customer.

> I am aware of other tellers who cashed items that resulted in cash losses in violation of overage shortage policy. These tellers were not pregnant when the items were negotiated. The[y] did not receive discipline in the form of termination. These tellers are, (sic) Judy Calvert, Ann Rickles and Leslie Zellner.

> When the foregoing list of tellers was discussed in my deposition in April 2001 I was still laboring under the false impression that the person presenting the check was not an AmSouth customer.

(Doc. 22).

11

## III.   DISCUSSION

### A.   Pregnancy Discrimination

The plaintiff claims that the defendant terminated her premised upon her sex and her

pregnancy.  (Doc. 1 at ¶ 13).  Title VII protects individuals from sex-based discrimination under

§ 2000e-2(a).  42 U.S.C. § 2000e-2(a).  The Pregnancy Discrimination Act ("PDA") provides:

> The terms "because of sex" or "on the basis of sex" include, but are not
> limited to, because of or on the basis of pregnancy, childbirth, or related medical
> conditions; and women affected by pregnancy, childbirth, or related medical
> conditions shall be treated the same for all employment-related purposes,
> including receipt of benefits under fringe benefit programs, as other persons not so
> affected but similar in their ability or inability to work, and nothing in section
> 2000e-2(h) of this title shall be interpreted to permit otherwise. . . .

42 U.S.C. § 2000e(k).  In this circuit, "[t]he analysis required for a pregnancy discrimination

claim is the same type of analysis used in other Title VII sex discrimination suits." *Armindo v.

Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000).  "In proving [a sex] discrimination claim,

a plaintiff can establish a *prima facie* case of discrimination through either direct evidence of

discrimination or a variation of the four-part test outlined in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) for circumstantial evidence." *Damon v.

Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999), *cert. denied*, 529

U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000), (citing *Carter v. City of Miami*, 870 F.2d

578, 581 (11th Cir. 1989)).

In this case, the plaintiff contends that she has presented sufficient circumstantial

evidence to demonstrate a disputed issue of material fact with respect to her pregnancy

discrimination claim.  She therefore argues that the court is required to deny the motion for

summary judgment.

The plaintiff contends that she can establish a case of pregnancy discrimination through circumstantial evidence. The circumstantial evidence standards are well established:

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases. First, the plaintiff must establish a *prima facie* case of discrimination. . . . The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment. [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework--with its presumptions and burdens--disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff--once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision--must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. Moreover, although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.133, 142-43, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105, 116-17 (2000) (internal citations and quotations omitted).

The defendant contends that the plaintiff cannot establish a *prima facie* case of pregnancy discrimination and that she cannot show that its articulated reason for her discharge is a pretext for discrimination. (Doc. 20 at 2-3).

### 1.    *Prima Facie* Case

The defendant contends that it is entitled to summary judgment because the plaintiff cannot establish a prima facie case of discrimination with regard to her termination.  Generally, to demonstrate a *prima facie* case of discrimination with regard to termination, a plaintiff must show: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated [non-pregnant] employees more favorably; and (4) she was qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999).  The plaintiff meets the first and second factors–she was a pregnant woman who was terminated.  The defendant contends, however, that the plaintiff cannot show that she was qualified for her position or that non-pregnant employees were treated more favorably.  (Doc. 20 at 3-4; Doc. 26 at 15-19).

### a.    Qualified for her position

The defendant contends that the plaintiff was not qualified to do the job because of her unsatisfactory performance.  (Doc. 26 at 15-17).  This argument is inconsistent with Eleventh Circuit authority on this issue, which states as follows:

> Our caselaw quite clearly instructs that plaintiffs, who have been discharged from a previously held position, do not need to satisfy the *McDonnell Douglas* prong requiring proof of qualification.  We have explained that the reason for this modification of *McDonnell Douglas* is that in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred.

*Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1360 (11th Cir. 1999) (internal quotations and citations omitted), *cert. denied*, 529 U.S. 1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000);  *see also Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir.), *cert. denied*, 464 U.S.

1018, 104 S. Ct. 549, 78 L. Ed. 2d 724 (1983) ("[I]n discharge and demotion cases, where a plaintiff has held a position for a significant period of time, qualification for *that* position, sufficient to satisfy the test of a *prima facie* case can be inferred.  However, where the position sought has not been held previously [such as in failure to promote and failure to hire cases] there is no basis for an inference of qualifications.") (emphasis added).

The plaintiff in this case held the position of teller or head teller for nearly seven years. She was apparently able to meet the defendant's standards to perform her duties sufficiently.  The court finds that she has met her burden of proving this aspect of the *prima facie* case.  The issue of whether or not she was "disqualified" because of her performance is thus reserved for the court's "evaluat[ion of] the pretextual nature of [defendant's] proffered nondiscriminatory reasons for [plaintiff's] termination." *Damon*, 196 F.3d at 1360.

### b.    Similarly-situated employees

The defendant contends that the plaintiff cannot establish a *prima facie* case of discrimination because she cannot point to similarly situated nonpregnant employees who were treated more favorably.  (Doc. 20 at 3).  The plaintiff asserts that she has produced a comparator in Leslie Zellner.  In her affidavit, Zellner states that she was a nonpregnant teller who at some time between August 1994 and March 1999 had "several occasions to cash checks on AmSouth accounts for customers which resulted in cash losses.  Specifically, [she] recall[ed] having two checks resulting in cash loss items which total[ed] $1,000.00 within one period of 12 months. These incidents were noted by management, but, no discipline action was taken and [she] was not terminated." (Doc. 19, Ex. L).  The defendant retorts that Zellner's situation is different than the plaintiff's and, therefore, she is not a comparator.

15

The court agrees with the defendant and finds that Zellner is not a comparator. Alexander was not terminated because she had in excess of $1,000.00 in cash loss items within a twelve-month period. The defendant's articulated reason for terminating her was that she had a "one time loss of $1,000 or greater" (doc. 19, ex. G) and she did not obtain a thumbprint or approval to cash the same because it exceeded her limit. The Eleventh Circuit has stated:

> "In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted). We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

*Maniccia*, 171 F.3d at 1368-69.

Upon review, it is evident that Alexander's situation and Zellner's situation are not sufficiently similar for purposes of establishing a *prima facie* case. The plaintiff's conduct involved a single transaction while Zellner's conduct occurred over a twelve-month period or involved more than a single incident. The defendant's policy specifically treats a "one time loss of $1,000 or greater" as a distinct category. (Doc. 19, Ex. G). The court finds that the situations are not sufficiently similar for purposes of comparison in this case.

"A plaintiff alleging pregnancy discrimination need not identify specific non-pregnant individuals treated differently from her, if the employer violated its own policy in terminating

her." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1321 (11th Cir. 2000) (citing *Byrd v. Lakeshore Hospital*, 30 F.3d 1380, 1383 (11th Cir. 1994)).  The plaintiff has presented evidence that both John T. Burks and Ruth Burks were AmSouth customers.  It is evident that the plaintiff's termination was premised, at least in part, on the incorrect assumption that she exceeded her $500.00 cashing limit for a noncustomer.  Accepting this premise as the court is required to do at this juncture, the plaintiff has still not demonstrated that the defendant violated its own policy in terminating her.  The applicable policy clearly provides that termination is within the disciplinary limits when a teller incurs a single loss in excess of $1,000.00.

The court is not satisfied at this juncture, however, that the defendant complied with its requirement that the decision makers "determine there are no mitigating circumstances to prevent the employee's termination." (Doc. 19 at Ex. G).  Ramsey testified that the only reason she considered not terminating the plaintiff was Hutchinson's comment that she was "a long-term teller" and "a good employee." (Ramsey Depo. at 28-30).  Hutchinson stated that they considered her past performance concerning the January 6, 2000 coaching strategy.  (Hutchinson Depo. at 62-63).  No one specifically reviewed her personnel file to further evaluate or investigate any mitigating circumstances.  Although it appears that the defendant reviewed some of her past conduct, it was a very limited review and not sufficient under the circumstances to overcome the plaintiff's contention that the defendant violated its own policies by failing to determine whether there were mitigating circumstances to prevent her termination. This allows her to satisfy the requirement for establishing a *prima facie* case.

2.      **Pretext**

a.      **Legitimate, Nondiscriminatory Reason**

Having established a *prima facie* case under *McDonnell Douglas*, the burden shifts to the

defendant to produce evidence showing that the adverse employment action was taken for a

legitimate, nondiscriminatory reason. *Reeves*, 120 S. Ct. at 2106. The Supreme Court outlined

this phase of the analysis as follows:

> Although intermediate evidentiary burdens shift back and forth under [the
> *McDonnell Douglas*] framework, "[t]he ultimate burden of persuading the trier of
> fact that the defendant intentionally discriminated against the plaintiff remains at
> all times with the plaintiff." *Burdine*, 450 U.S. at 253. And in attempting to
> satisfy this burden, the plaintiff--once the employer produces sufficient evidence
> to support a nondiscriminatory explanation for its decision--must be afforded the
> "opportunity to prove by a preponderance of the evidence that the legitimate
> reasons offered by the defendant were not its true reasons, but were a pretext for
> discrimination." *Ibid.*; *see also St. Mary's Honor Center*, [509 U.S. 502,]
> 507-508 (1993). That is, the plaintiff may attempt to establish that he was the
> victim of intentional discrimination "by showing that the employer's proffered
> explanation is unworthy of credence." *Burdine, supra*, at 256.

*Reeves*, 120 S. Ct. at 2106.

The defendant contends that it terminated the plaintiff because the decision-makers

believed that she had cashed the $1,500.00 check improperly because of their perception that it

was presented by a noncustomer who was not thumbprinted and because the check amount was

in excess of her authority, resulting in a violation that included termination as a consequence.

b.      **Challenge to the Proffered Legitimate, Nondiscriminatory
         Reason**

The plaintiff contends that the proffered legitimate, nondiscriminatory explanation is a

pretext for discrimination. In discussing the burden that must be met by the plaintiff to show

pretext, the Eleventh Circuit stated as follows:

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted). The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Sheridan*, 100 F.3d [1061,] 1072 [*cert. denied*, 521 U.S. 1129, 117 S. Ct. 2532, 138 L. Ed. 2d 1031 (1997),] (citation and internal quotation marks omitted); *see also Walker*, 53 F.3d [1548,] 1564 [(1995)] (Johnson, J., concurring) (discussing methods of proving pretext). However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action. At that point, judgment as a matter of law is unavailable.

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

In attempting to meet the *Combs* standard, the plaintiff offers several items of evidence that allegedly show that the proffered reason is unworthy of credence. First, the plaintiff argues that pretext is shown by the defendant's failure to recognize that the check in question was an AmSouth check presented by an AmSouth customer (Ruth (Hodges) Burks) who was known to the plaintiff and therefore cashing the same was within her allowable limits and a thumbprint was not necessary. (Doc. 19 at 15, 17-18). She states that these facts "destroy the rationale for terminating [her]." (*Id.* at 19).

The court has closely examined the plaintiff's challenge to the defendant's proffered reason for the termination. When an AmSouth customer cashes a check drawn on an AmSouth

account, a thumbprint is not required. (Ramsey Depo. at 50). It is deemed sufficient if the teller obtains the account number of the person cashing the check. (*Id.*). When an AmSouth check is cashed by a non-account holder, a thumbprint is required. (*Id.* at 49-50, 73-74). In this case, it appears that the plaintiff knew Burks as an AmSouth customer and wrote her license number instead of the account number on the forged check when she cashed it. She did not realize that this was the reason for her actions until the Hutchinson's deposition.[18] Similarly, the evidence shows that the decision makers, Hutchinson, Ramsey and Kemp, were acting premised on the belief that Ruth (Hodges) Burks was not an AmSouth customer at the time of the decision to terminate the plaintiff. In Ramsey's deposition, she acknowledges that Burks was a customer (Ramsey Depo. at 58-61); but there is no evidence that she knew that at the time of the decision.[19] In Hutchinson's deposition, he states that he first became aware of the problem with the check around January 13, 2000. (Hutchinson Depo. at 34). Nothing in the record demonstrates that he was aware that Ruth Burks was an AmSouth account holder at the time of the termination or that the plaintiff knew her to be an AmSouth account holder.[20] Finally, nothing demonstrates that Kemp was aware of these facts.[21]

_____

[18] She did speculate that this was the reason in her statement made during the unemployment compensation process. (Doc. 17, Alexander's Depo., Def. Ex. 12).

[19] It is evident that the check was issued on an AmSouth account, but what is missing is that it was not evident to Ramsey that Burks was an AmSouth account holder as well. She stated that this would be determinable by talking with the teller and by looking at the back to see how the transaction was handled. (Ramsey Depo. at 70). If the person cashing the check was an AmSouth account holder, that person's account number should have been placed on the check. (*Id.*). In the present case, Burks' account number was not on the check, her driver's license number was there. Additionally, nothing indicates that Ramsey was aware at the time of the termination that Burks was the "Ruth W. Hodges" associated with the 1980 AmSouth account signature card that was shown to her at the deposition.

[20] Although the court may not be impressed by Hutchinson's lack of information on this point, that does not demonstrate a basis for this court to submit this matter to a jury for resolution. This is particularly true because the investigative reports generated in this matter do not reflect this fact even though the investigator, Forrest Duncan, apparently received a copy of Ruth (Hodges) Burks' signature card around October 22, 1999. (Ramsey Depo. at Ex. 11 & 15).

[21] Kelly Kemp was not deposed and did not submit an affidavit in this matter.

The plaintiff next argues that pretext is demonstrated by the fact that the defendant characterized the check as a loss when the restitution was paid on January 6, 2000.  (Doc. 19 at 19 & Ex. I).  As with the last item, there is no evidence that any of the decision-makers were aware of the fact that the restitution had been paid at the time of the termination.  The testimony of Ramsey merely establishes that as of the date of the deposition, May 31, 2001, the $1,500.00 had been paid.  (Ramsey Depo. at 48-49).  She was not queried as to when she learned that.  The exhibit copy of the check does not demonstrate when the check was paid; it only states the date it was written.  (Doc. 19 at Ex. I).  Nothing in the record shows when the check was received or cashed by AmSouth.  The evidence is not sufficient to demonstrate pretext.

The plaintiff also argues that pretext is demonstrated by Hutchinson's "misrepresentations" to the Alabama Unemployment Compensation Commission in connection with the plaintiff's application for unemployment benefits.  (Doc. 19 at 8 & 19).  She states that he misrepresented the following: (1) Alexander cashed a check without proper I.D., (2) this check turned out to be a forged instrument that was not reported by the customer until November 16, 1999, (3) security attempted to collect the money for ninety days, and (4) the check was deemed a loss on January 11, 2000.  (Doc. 19 at 8).  Hutchinson acknowledged at his deposition that it was not correct to say that the plaintiff cashed the check without proper identification (Hutchinson Depo. at 46) and that the correct date that the customer complained about was October 12, 1999 (*id.* at 47).  Hutchinson could not explain the statements in the unemployment report that the security department attempted to collect on the check for 90 days.  (*Id.* at 50-51).  The plaintiff's last assertion, that the record shows that the statement in the report that the security department "turned" the check over as a loss on January 11, 2000 was false, is

21

unexplained by the defendant. The record does not reflect whether as of the date of the interview, February 7, 2000, Hutchinson was aware of the status of the loss, particularly, the payment of any restitution. He does not explain what he knew in this regard and when he learned it.

The court does not find these items individually to be sufficient to overcome the motion for summary judgment. First, with regard to the identification, nothing in the report delineates whether the discussion between the interviewer and Hutchinson concerned a driver's licence, a thumbprint or any other type of identification. It merely states that she did not get proper identification. What the plaintiff ignores is the testimony that the failure to obtain a thumbprint, even of a known customer, can still result in the teller being held responsible if the item is returned and the loss is over $1,000.00. (Hutchinson Depo. at 56-57; Ramsey Depo. at 52-53). The evidence also demonstrates that it was the "informal practice of the tellers in the Gardendale Branch to negotiate transactions for regular customers with minimum formality." (Doc. 22 at 1). However, the court does not believe this evidence alone demonstrates pretext.

Second, with regard to the discrepancy in the customer complaint date (October 9, 1999, versus November 16, 1999), the court does not find this in and of itself significant. It would not be sufficient for the jury to premise a finding for the plaintiff.

Third, with regard to the comment that the security department attempted to collect on the money owed for 90 days and then, on January 11, 2000, deeming the item a loss, the court finds that these statements alone are insufficient to show pretext, particularly, where the time between the customer complaint and the termination was approximately three months. Additionally, as

already discussed, there is no evidence that the decision-makers knew that the restitution had been made at the time of the interview.

The plaintiff next asserts that pretext is demonstrated in the statements of Hutchinson and Gann when she was terminated. Specifically, she states that Gann's suggestion that she not tell a prospective employer about her pregnancy "certainly infers that AmSouth considered pregnancy a less than attractive proposition for a working woman. This is circumstantial evidence of a hidden intent to discriminate which could easily be believed by a jury." (Doc. 19 at 19-20). In considering this evidence, it must first be placed in context.

During the termination meeting, the plaintiff commented about how would she find another job since she was pregnant. Hutchinson told her that an employer could not discriminate against her because of her being pregnant. (Alexander Depo. at 68-69). Either Hutchinson or Gann "mentioned" that because she was not "showing yet," she would be able to conceal her pregnancy from a prospective employer. (*Id.*). Under the facts, this is not enough for a jury to make the quantum leap suggested by the plaintiff that this is sufficient to demonstrate that AmSouth improperly viewed pregnancy as an undesirable condition for an employee.

The plaintiff further challenges the legitimacy of the defendant's termination reason by asserting that the "consultation" regarding her termination between Hutchinson, Ramsey and Kemp "was little more than a[n] approximately thirty-minute three-way phone call." (Doc. 19 at 20). She adds this by stating that Ramsey did not take into account her full personnel file, including the commendations, good reviews and evaluations. (*Id.*). The length of time spent discussing the plaintiff's termination in-and-of itself is not a basis for this court to conclude that summary judgment should be denied. Were this court to conclude that a thirty-minute discussion

23

is enough to show pretext, the court would be speculating.  The court also notes that the record

shows that there was more than one conversation involved.  Hutchinson stated that there were

several conversations over the course of the week, culminating in the last one with him, Ramsey

and Kemp.  (Hutchinson Depo. at 66).  The record further demonstrates that Hutchinson also

talked with security to verify their information.  (*Id*. at 64).  The court cannot and will not so find

that the length of the consultation establishes pretext in this case.[22]

Having considered the plaintiff's assignment of pretext individually, the court must now

---

[22]  The defendant also argues that the plaintiff's discharge claim is barred from review because the Alabama
Department of Industrial Relations ("ADIR") found that she was properly discharged.  (Doc. 26 at 21, *citing Williams v.
Alabama Indus. Dev't. Tr'g.*, 146 F. Supp. 2d 1214, 1223 (M.D. Ala. 2001); *Wal-Mart Stores, Inc. v. Smitherman*, 743 So. 2d
442, 444-48 (Ala. 1999), and *Rigby v. Marshall*, 134 F. Supp. 2d 1259, 1262-64 (M.D. Ala. 2000).  The court finds these cases
distinguishable.  In *Williams*, the court stated:

> Because the Alabama Department of Industrial Relations (ADIR) found that Williams was
> discharged for a "dishonest or criminal act in connection with his work," *ALA. CODE* § 25-4-78(3)(a) (1975),
> the doctrine of claim preclusion, *perhaps*, bars him from arguing that he did not commit these violations.  *See
> Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *Wal-Mart Stores, Inc. v. Smitherman*, 734 So. 2d
> 442, 444-48 (Ala. 1999) (recognizing the preclusive effect of ADIR's decisions).

*Williams*, 146 F. Supp. 2d at 1223 (italics added).  The court does not find this language to require, even if it were binding on
this court, a determination of issue preclusion.  It is evident that the ADIR did not have the full and accurate information now
before this court.

In *Smitherman*, the court did find that the doctrine of issue preclusion applied when the plaintiff filed a retaliatory
discharge claim under the State workers' compensation laws before the ruling on her unemployment compensation claim had
become final.  *Id.*, 743 So. 2d at 444.  The court listed the elements:

> " ' "(1) there is identity of the parties or their privies; (2) there is identity of issues; (3) the parties had an
> adequate opportunity to litigate the issues in the administrative proceeding; (4) the issues to be estopped were
> actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be
> estopped were necessary to the administrative decision." ' "

(*Smitherman*, 743 So. 2d at 445) and concluded that they were all presented.  Unlike *Smitherman*, the circumstances in this case
tend to show that the parties did not have an adequate opportunity to litigate the focal issue.  There are three aspects that prevent
application of issue preclusion in this case.  First, the plaintiff was not shown the video, the check, or the investigator's report
showing Burks picture until after this litigation was filed.  Second, the defendant, through Hutchinson, provided the ADIR with
inaccurate information that was not clarified before the determinations by the ADIR.  Third, although the plaintiff had counsel
representing her soon after the termination, she appears to have been representing herself before the ADIR.  The documents show
that only she appeared at the hearings.  (Doc. 17, Alexander Depo. at Def. Ex. 13 & 14).

In *Rigby*, the court again found that issue preclusion was applicable; however, that case is distinguishable because the
plaintiff therein was unable to explain why he raised certain issues of harassment after the law suit was filed.  The court
specifically noted that the plaintiff offered "no reason for his silence" in the prior administrative proceedings.  *Id.*, 134 F. Supp.
2d at 1263-64.

examine whether when considered collectively, they are sufficient. *See Bass v. Board of County Com'rs., Orange County, Fla.*, 256 F.3d 1095, 1118-19 (11th Cir. 2001) ("While the other actions might not have individually risen to the level of adverse employment action under Title VII, when those actions are considered collectively, the total weight of them does constitute an adverse employment action."). The court finds that they are sufficient in sum in this case to overcome the motion for summary judgment. It is evident that, for whatever reason, the decision makers in this case, Ramsey, Kelly and Hutchinson, incorrectly perceived the events that led to the plaintiff's termination. The defendant also would not allow the plaintiff to see the check that was passed or the video that depicted Burks until Hutchinson's deposition. The decision makers' consideration of the mitigating factors in the plaintiff's case is suspect due to the fact that there was no examination of the plaintiff's personnel file other than concerning the January 6, 2000 incident. No consideration was given to the plaintiff's prior evaluations and commodations. Additionally, Hutchinson also presented incorrect information to ADIR concerning the plaintiff's claim for unemployment compensation that remains unexplained.[23]

## IV.   CONCLUSION

For the reasons set forth above, the court finds that "Defendant's Motion for Summary Judgment" (doc. 17) is due to be denied as to the plaintiff's pregnancy discrimination claim and granted as to all the plaintiff's other claims. The court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion.

---

[23] The court also notes that Hutchinson stated at his deposition that he did not recall having such a conversation, but that it could have occurred. (Hutchinson Depo. at 82-83).

**DONE** this _____16th_____ day of May, 2002.


JOHN E. OTT
United States Magistrate Judge